IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOUIS MICKENS-THOMAS, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | NO.  99-6161 |
| v. | : | 04-1615 |
| | : | |
| DONALD VAUGHN, et al., | : | |
| Respondents. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                                                                           June 7, 2006

The entire background of this case need not be repeated as it is well known to the parties and also set forth in several prior District and Circuit Court opinions.

It is of crucial importance, however, to set forth the facts leading up to Petitioner's second arrest as a parolee violator.  This arrest occurred because on July 20, 2005, Forensic Treatment Services (FTS) discharged him from its program, which he had entered on October 27, 2004.  It is this arrest that, Petitioner argues in the context of the history of this case, has a sufficient appearance of vindictiveness to support a finding of a due process violation.[1]  It also, Petitioner argues, is a violation of the *Ex Post Facto* Clause.

---

1. Petitioner also argues that automatically arresting an individual as a parole violator whenever he is discharged from FTS is also a due process violation, but the record does not support a finding of such a practice with respect to Respondent.

Three hearings were held in response to this third motion by Petitioner to enforce the habeas corpus judgment. From those hearings and related exhibits, I make the following findings of fact.

## I. **FINDINGS OF FACT**

1. As a condition of his parole, Petitioner had to attend mandated group and individual therapy sessions (N.T. 7/26/05 p. 27) and successfully complete it. (N.T. 7/26/05 p. 56).

2. As a condition of his parole, Petitioner was to refrain from assaultive behavior. (N.T. 7/26/05 p. 56).

3. The mandated group and individual therapy sessions in the case now before the court commenced on October 27, 2004 and were provided by Forensic Treatment Services (FTS). (N.T. 7/26/05 p. 2).

4. FTS had previously attempted to treat Petitioner in January of 2004. Because he refused to sign a statement admitting he committed a sexual offense, FTS discharged him from the program in April of 2004. As a result of his being discharged, Petitioner was arrested as a parole violator. (N.T. 7/26/05 p. 30).

5. On motion of Petitioner, this court directed that he be released on parole by order dated April 29, 2004.

6. Soon thereafter, he was placed in a sex offender therapy program in Reading, but was discharged prior to successful completion for failure to pay for services.

He was not arrested as a parole violator. (N.T. 7/26/05 pp. 62, 63). Instead, he was directed to report to FTS (*see* Finding 3) on October 27, 2004.

       7.       In this second session with FTS, Petitioner conditions contained an addendum that participating in treatment was in no way an admission of guilt. *(See* Exhibit D-3).

       8.       Dr. Veronique Valliere was at all pertinent times the president and owner of FTS. *(See* Curriculum Vitae marked D-6).

       9.       Dr. Valliere at the first hearing in July explained the goal with respect to Mr. Thomas' attending the FTS program as follows:

> That we would address the issues involving his past criminal and sexual conduct, including any criminal value systems, adherence to beliefs, or ideas that would promote in the future his maladjustment to the community or presenting a risk of violence or a danger as he had in the past.

(N.T. 7/26/05 p. 86).

       10.      Sometime in June of 2005, Petitioner told his parole officer, Agent Mondello, with regard to a woman at the church he attended that "he grabbed her face, pre-positioned her face and then kissed her against her will...on the lips." (N.T. 7/26/05 p. 34).

       11.      In response to this revelation, on July 15, 2005, Petitioner was given a monitoring device to wear and a curfew of 8:30 p.m. He was put on the monitoring device because of the technical violation of condition 5C, assaultive behavior. (N.T. 7/26/05 p. 42).

12. Agent Mondello thought he should have been arrested for assaultive behavior, but his superiors decided on electronic monitoring. (N.T. 7/26/05 pp. 43-47).

13. On July 20, Agent Mondello was notified that Petitioner had been discharged from the FTS program and he was arrested for that reason. (N.T. 7/26/05 p. 50).

14. The specific grounds for being discharged from the FTS program by being in violation of the program treatment rules, as listed on P-1, the Notice of Charges and Hearings were:

> 1) You confronted your individual FTS treatment counsel, Deidre Young, during a counseling session and made inappropriate sexual comments to her with a demeanor that caused her to feel intimidated, stating, "You're just jealous that I kissed Millie and not you" and "I don't know what sex is, you need to teach me." 2) You made threatening statements to two other group members in the treatment program stating to one: "Don't you take sides with those people (staff) against me. If I had my gun, I would shoot you."

15. While Petitioner had prior contact with FTS (*see* Finding 4), he was not admitted to the program at that time (N.T. 12/14/05 p. 26) and had no therapy sessions.

16. It was not until October of 2004 that Petitioner was admitted for therapy sessions into FTS. In that regard, Dr. Valliere testified as follows:

> Mr. Thomas applied to get back in the program (in October of 2004). I believe he wasn't successful or couldn't afford the previous program, so asked to be readmitted. At that time due to his previous difficulty signing our informed consent, we had what we call a multi-disciplinary team meeting prior to his readmission. Mr. Thomas was

there, myself, my treatment team, Mr. Mondello, and Mr. Becker, I believe, the parole supervisor.

And during that meeting I discussed with Mr. Thomas what was going to make him treatable this time, as he refused to sign the treatment program consent previously. And, we discussed his commitment toward treatment, goals he could work on. I explained to him I wasn't willing to readmit him if he wasn't going to present some goals to work on regarding his history of sexual aggression and criminal behaviors.

His attorneys were aware of this appointment, and were contacted either during, or right after this staffing to see if our negotiated treatment contract was acceptable. We added an exclusion for Mr. Thomas that he didn't have to admit to sexual abuse in the crime he was convicted of, but we knew of a variety of other behaviors, that I've testified to before, as well as his criminality that we thought we could address.

During that meeting we discussed whether he had any concerns or issues with the program's history with him. Whether he had any concerns he wanted to discuss regarding the testimony I provided. Whether he felt unduly picked on, or had any concerns. He said he didn't. He made some commitments about what he was willing to work on. Signed the treatment consent, and was admitted to the program at that time – after, you know, he signed that consent, and then began group and individual therapy.

THE COURT: His lawyers – the present lawyers here in court were the ones involved in this? You said something about his lawyers being involved –

THE WITNESS; They were aware of his application, and they were –

THE COURT: Oh, okay.

THE WITNESS: They approved of his signing the treatment program rules.

> . . . Because we had had a history, I wanted to make sure that he was clear on coming back. That he had no major concerns, that he had no issues that we needed to work out or negotiate. That our expectations of him were clear, that he understood where we were coming from, and that the treatment process would be clear.

17. Three persons were permitted to testify as experts in addition to Dr. Valliere: Dr. Barbara Ziv, Dr. Michael Glass and Dr. Robert Sadoff.

18. Dr. Glass testified that because Dr. Valliere had made it clear on two separate occasions that she was not supportive of petitioner, there was no possibility that meaningful treatment could take place. (N.T. 10/26/05 p. 16).

19. Dr. Glass also testified that a treater should not serve as an expert for patients they're treating. (N.T. 10/26/05 p. 24).

20. Dr. Glass, on cross, testified that he understood that the focus of a sex offender treatment is to keep society safe, so that the sex offender understands and avoids high risk behavior or high risk situations. N.T. 10/26/05 p. 25. Petitioner is an admitted sex offender. (*See* p. 3, No. 6 of D-3).

21. Dr. Sadoff testified that petitioner should not have been accepted back into the FTS program because he was previously discharged from it and Dr. Valliere testified against him at a previous hearing. (N.T. 10/26/05 pp. 47, 48).

22. Dr. Sadoff also testified as follows:

> Q. Now, when you say that Dr. Valliere – this is reading directly from your report – "It is clear that Dr. Valliere did not trust Mr. Mickens-Thomas, and he clearly did not trust her." What is the basis for your saying that? Did you – you never spoke to Dr. Valliere?

A. Never spoke to you. It's my –

Q. You never spoke to Mr. Mickens-Thomas, and yet here's an assumption that they quote, unquote, Clearly did not trust each other.

A. You asked me, am I giving my opinion. This is my opinion, within reasonable medical certainty, that based on the records that I reviewed, that there would have to be a lack of trust on both sides, because of the previous history that they each had with one another.

Q. So it was an assumption on your part and –

A. It's an opinion.

Q. – your opinion is based on that assumption?

A. It's an opinion based on what I reviewed in the record, that's correct.

Q. Okay. And your opinion might change if it turned that there was a – what you believe I referred – referred to a full disclosure of the prior relationship and some acquiescence by Mr. Mickens-Thomas into – going into that program with that understanding, correct?

A. With the understanding that Dr. Valliere would not have any direct relationship with the treatment.

Q. Okay. And you have no information that she was actually the person who provided any of the one-on-one counseling for Mr. Mickens-Thomas?

A. I don't know if she did that, but she certainly had supervisory authority and power over those who did.

23. Dr. Barbara Ziv testified that Dr. Valliere acted within standards of treatment. (N.T. 12/14/05 p. 96).

24. She testified about sex offender treatment as follows:

> Sex offender treatment is focused – it's really based on a model that develops sort of along the same lines as substance abuse, recidivism treatment, which is to understand what are the situations, both internal and external, that lead somebody to commit a sex crime, and how we can teach that person new ways of responding to the world, and how we can change the environment, or have them be more attuned to the environment, such as to decrease their risk of re-offending.

25. A series of incidents led up to petitioner being discharged from the program by Dr. Valliere. (*See* N.T. 7/26/05 pp. 93-99). No one employed by Respondent had input in her decision to discharge Petitioner from the program. (N.T. 7/26/05 p. 98).

26. Specifically, Agent Mondello had no input in Petitioner's discharge. He neither urged nor suggested that FTS discharge him. (N.T. 7/26/05 p. 63).

27. There is no evidence that discharge from the program <u>always</u> results in arrest of the parole violator by Respondent.

28. When an arrest occurs, there are procedural safeguards in place to enable the offender to get a speedy hearing.

29. For reasons not explained to this court, Petitioner's counsel did not take advantage of those particular safeguards and the hearing on Petitioner's parole violation was not held until February 10, 2006.[2]

---

2. According to Respondent, a parole hearing was held on February 26, 2006, and although the Board of Probation and Parole found Petitioner to be a technical violator eligible for relief in April, Petitioner has never filed a request for administrative review. (*See* Respondent brief, p. 11).

30. Petitioner himself never testified at any of the hearings either to agree with or dispute any of the findings of which he might have had particular knowledge.

## II. ARGUMENT

Petitioner argues that the constitutionality of Respondent's conduct must be evaluated against the background of this case. I agree; otherwise, this petition would be instantly dismissed.

In my judgment, however, counsel's passionate pursuit of Petitioner's claim may have clouded somewhat his objectivity. For example, in referring to the principal due process violation arising from Petitioner's arrest, he argues that Petitioner did not violate any rule of the program. But the testimony of Dr. Valliere refutes this contention. She testified that he was disabling the therapeutic process. Her testimony referred to in Finding of Fact 25 clearly shows he violated Rule 22 of the program.

But even before considering whether Petitioner violated any rule of the program, counsel argues that Dr. Valliere should not have been involved in Petitioner's treatment in the first place. While I respect the testimony of Petitioner's expert witnesses, it is clear, as Petitioner's counsel concludes, that the American Psychology Code of Conduct does not address the issue.

Counsel goes on to argue that even if Dr. Valliere's role in therapy was not unethical, there is still an overriding due process violation. In support of this argument,

counsel states that "the specific supporting evidence in the Notice of Charges relied on for the FTS discharge decision is 'inappropriate sexual comments' made to treatment counselor, Deidre Young." (Petitioner's brief p. 15). These comments, he argues, "cannot be a legitimate basis for discharge." First of all, those comments alone were not the basis for discharge and secondly, Petitioner misses the point. Respondent had no input into the discharge of Petitioner from FTS. Instead, upon hearing of the discharge, Respondent violated his parole, an action entirely appropriate inasmuch as successful completion of the program was a condition of Petitioner's parole.

Counsel's argument about the manner in which the comments were made to Deidre Young misses the point as well. Contrary to his argument about Rule 22, that rule, in addition to initially stating that reporting deviant thoughts, etc. will not result in discharge, continues to state that escalating high risk behavior will. This is ultimately the reason for Petitioner's discharge from the program as I read the testimony of Dr. Valliere.

Counsel also takes issue with Dr. Valliere's treating the kiss as an indecent assault, claiming that Petitioner's conduct was not a crime. In this regard, it should be noted that Petitioner himself has never contested the description of this incident as Agent Mondello testified about it. *(See* Finding of Fact 10). That description is at the very least *prima facie* evidence of an indecent assault. (*See* 18 Pa. C.S.A. § 3101 definition of forcible compulsion, indecent contact and § 3126(a)(1)(2) Indecent Assault). Another example of counsel's clouded objectivity is his reference in his brief (*see* p. 17) to a

10

comment made by the court during the opening argument of Petitioner's counsel before any testimony was heard. As I have found, there was more than just kissing a woman in church.

Counsel argues about the obvious disagreement among experts on the treatment or lack thereof that Petitioner was receiving. I cannot find by a preponderance of the evidence that the FTS treatment program for Petitioner was inappropriate. Indeed, for some time, Petitioner seemed to be having some degree of success. As his counsel points out, for nine months, Petitioner attended and participated in sessions and his adjustment on parole indicated no problems. Thus, by May 25, 2005, his travel restrictions were lifted.

Counsel concludes by arguing that even if Petitioner's discharge from the FTS program was appropriate, there is no basis for violation in the absence of a willful violation. But this is at least one reason to have a parole hearing – to determine whether there was a willful violation.

Counsel's final argument is that there is sufficient evidence of vindictiveness and retaliation to find a vindictive due process violation. Because of the history of this case, this allegation has been my prime concern and that is why I have attempted to carefully review the evidence in that regard.

Are Agent Mondello and Dr. Valliere in league to put Petitioner back in prison? Have the prior actions by this court in releasing Petitioner been the basis for

retaliation and vindictiveness on their part in the incident now before the court? There is no direct evidence but can such an inference be fairly drawn, as Petitioner suggests, that such a motive existed?

Initially, it seemed to me that this was much adieu about one adult kissing another. But when the description of that incident was presented in testimony, when Petitioner's response to it was explained and when Dr. Valliere ultimately explained her rational for discharging Petitioner without any input from Respondent, I concluded that the action taken by Respondent did not violate any of Petitioner's constitutional rights including an *ex post facto* violation.

### III.  CONCLUSION

Petitioner's discharge from the FTS program was not done vindictively or in retaliation. Instead, his discharge from the program was warranted as previously explained. Thereafter, Respondent acted lawfully in arresting him for violation of a condition of his parole.

Accordingly, the following order is entered:

## ORDER

**AND NOW**, this 7th day of June, 2006, it is hereby **ORDERED** that Petitioner's Amended Third Motion to Enforce Habeas Judgment is **DENIED**.

BY THE COURT:

*s/ Ronald L. Buckwalter, S. J.*
RONALD L. BUCKWALTER, S.J.